Robert C. Moest, Of Counsel, SBN 62166
**THE BROWN LAW FIRM, P.C.**
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ANAND ROY, derivatively on behalf of BLOCK, INC., <br><br> Plaintiff, <br><br> v. <br><br> JACK DORSEY, ROELOF BOTHA, AMY BROOKS, PAUL DEIGHTON, RANDY GARUTTI, JIM MCKELVEY, MARY MEEKER, NEHA NARULA, LAWRENCE SUMMERS, DAVID VINIAR, DARREN WALKER, SHARON ROTHSTEIN, ANNA PATTERSON, and AMRITA AHUJA, <br><br> Defendants, <br><br> and <br><br> BLOCK, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **DEMAND FOR JURY TRIAL** <br><br><br><br> <u>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**</u> |

Verified Shareholder Derivative Complaint

## INTRODUCTION

Plaintiff Anand Roy ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant Block, Inc. ("Block" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jack Dorsey ("Dorsey"), Roelof Botha ("Botha"), Amy Brooks ("Brooks"), Paul Deighton ("Deighton"), Randy Garutti ("Garutti"), Jim McKelvey ("McKelvey"), Mary Meeker ("Meeker"), Neha Narula ("Narula"), Lawrence Summers ("Summers"), David Viniar ("Viniar"), Darren Walker ("Walker"), Sharon Rothstein ("Rothstein"), Anna Patterson ("Patterson"), and Amrita Ahuja  ("Ahuja") (collectively, the "Individual Defendants," and together with Block, "Defendants") for breaches of their fiduciary duties as controlling shareholder, directors and/or officers of Block, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and for violations of Sections 14(a), 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Block, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from February 26, 2020 through April 30, 2024, inclusive (the "Relevant Period").

2.     Block is a financial technology company founded in 2009 that uses financial technology to facilitate payment solutions. Block offers two primary products: Square and Cash App. Square utilizes smart phones to process credit card transactions for small and medium-sized businesses, while Cash App enables peer-to-peer money transfers, debit cards, investing in stocks and bitcoin, savings accounts, and money transfers.

3.     Between 2019 and 2023, Block experienced rapid growth with respect to its revenues, with revenues growing from $1.31 billion in 2019 to $21.92 billion in 2023. However, investors were unaware that the primary contributing factor to this rapid growth was the use of the Company's platforms for illegal activities.

4.     During the Relevant Period, the Individual Defendants issued or caused the Company to issue false and misleading statements and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose, *inter alia*, that: (i) the Company failed to monitor the nature of transactions that were being processed on its platforms and lacked due diligence practices; (ii) the Company became a hotbed to facilitate illegal activities by imposing minimal obligations on users seeking to open accounts and encouraging the use of bitcoin on its platforms; (iii) Company management disregarded signs that their platforms were being used for unlawful and unethical activities (collectively with (i) and (ii), the "Customer Misconduct"); (iv) as a result, the Company was facing damage to its reputation and possible regulatory risk, and the Company's statements concerning its business, prospects, and operations were materially misleading and lacked a reasonable basis at all relevant times.

5.     The truth began to emerge on March 23, 2023 when Hindenburg Research published a report (the "Hindenburg Report") alleging that Block's growth was largely caused by "the company's willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fees as revolutionary technology, and mislead investors with inflated metrics." The Hindenburg Report detailed that Cash App was used for, *inter alia*, identity fraud, drug trafficking, sex trafficking,

Verified Shareholder Derivative Complaint

contract killing payments, and COVID-19 relief fraud, noting that "Cash App's embrace of non-compliance begins by making it easy for users to get on the platform, easy for them to get back on the platform if their accounts are closed, and easy to remain anonymous or operate under blatantly false identities."

6.     On this news, Block's stock price fell $10.77 per share, or about 15%, from a closing price of $72.65 per share on March 22, 2023 to close at $61.88 per share on March 23, 2023.

7.     The truth continued to emerge on August 3, 2023 when the Company revealed that the SEC and the U.S. Department of Justice ("DOJ") were investigating the allegations contained in the Hindenburg Report.

8.     On this news, the price per share of Block's stock fell $10.03, or nearly 14%, from a closing price of $73.55 per share on August 3, 2023 to close at $63.52 per share on August 4, 2023.

9.     The truth continued to emerge on February 16, 2024 when *NBC News* reported that federal regulators were investigating allegations by whistleblowers that Cash App had failed to perform due diligence on its customers, which enabled the platform to be used for illicit activities. In particular, *NBC News* reported that Block had failed to implement any "effective procedure to establish the[ir] identit[ies][.]" The report further alleged that the Company's management was intentionally failing to conduct proper due diligence in order to maximize the number of new customer accounts being opened as a way to generate more revenue.

10.     On this news, Block's stock price fell $3.84 per share, or 5%, from a closing price of $69.48 per share on February 15, 2024 to close at $65.64 per share on February 16, 2024.

11.     The truth fully emerged on May 1, 2024 when *NBC News* reported that federal prosecutors were investigating Block due to allegations by a former employee that: (i) the Company failed to conduct basic due diligence when acquiring customers; (ii) Square had

Verified Shareholder Derivative Complaint

processed thousands of transactions involving counties subject to economic sanctions; and (iii) the Company had processed cryptocurrency transactions for terrorist groups.

12. On this news, Block's stock price fell $6.16 per share, or about 8%, on May 1, 2024, from a closing price of $73.00 per share on April 30, 2024, to close at $66.84 per share on May 1, 2024.

13. In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing Block to repurchase its own stock at prices that were artificially inflated due to the foregoing misrepresentation. Indeed, between November 2023 and April 2024, approximately 4,468,000 shares of Block were repurchased at artificially inflated prices, costing the company approximately $330 million. As the Company's stock was actually worth only $66.84 per share, the price at which it was trading when the markets closed on May 1, 2024, the Company overpaid for repurchases of its own stock by approximately $31.4 million in total.

14. Additionally, in breach of their fiduciary duties, the Individual Defendants, during the Relevant Period, caused the Company to fail to maintain adequate internal controls and to engage in the Customer Misconduct.

15. In light of the Individual Defendants' misconduct—which has subjected the Company, its Principal Executive Officer ("PEO"), and its Chief Financial Officer ("CFO"), to a federal securities fraud class action lawsuit pending in the United States District Court for the Northern District of California (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, losses from the CFPB action and penalty, losses from the SEC and DOJ investigations, and losses due to the unjust enrichment of Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

16. The Company has been substantially damaged as a result of the Individual

Verified Shareholder Derivative Complaint

Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

17. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the PEO's and CFO's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors ("Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder. Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

19. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

20. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

21. Venue is proper in this District because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

**Plaintiff**

22.    Plaintiff is a current shareholder of Block. Plaintiff has continuously held Block common stock since first purchasing the stock on August 4, 2020.

**Nominal Defendant Block**

23.    Block is a Delaware corporation with principal executive offices at 1955 Broadway, Suite 600, Oakland, California 94612. Block's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "XYZ."

**Defendant Dorsey**

24.    Defendant Dorsey is a cofounder of the Company and has served as its PEO and as the Chairman of the Company's Board since July 2009, having previously served as its CEO and President since July 2009 until his title changed to Block Head as of April 2022. Dorsey beneficially owned 1,000,000 shares[1] of Class A Block common stock, worth roughly $81.5 million.[2] As of March 31, 2024, Defendant Dorsey beneficially owned 48,844,566 shares of the Company's Class A and Class B common stock combined, representing 41.3% of the Company's outstanding shares, thus making Defendant Dorsey a controlling shareholder of the Company.

25.    During the Relevant Period, before the fraud was exposed, Defendant Dorsey sold *approximately 2.5 million* shares of Company stock on inside information, for which he received approximately *$574.3 million* in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

**Defendant Botha**

26.    Defendant Botha has served as a Company director since January 2011 and as the Company's Lead Independent Director since June 14, 2022. He also serves as a member of the Audit and Risk Committee and the Compensation Committee. Defendant Botha

---

[1] The number of shares owned by each Individual Defendant is as of March 31, 2024.
[2] The Individual Defendants' holdings valuations of Company stock are based on the closing price on April 1, 2024 of $81.46 per share.

Verified Shareholder Derivative Complaint

received compensation from the Company in 2023 totaling $374,618. As of March 31, 2024, Botha beneficially owned 1,260,452 shares of Class A Block common stock, worth approximately $102.7 million.

**Defendant Brooks**

27.    Defendant Brooks has served as a Company director since October 2019. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Brooks received compensation from the Company in 2023 totaling $292,220. As of March 31, 2024, Defendant Brooks beneficially owned 12,780 shares of Class A Block common stock, worth approximately $1 million.

**Defendant Deighton**

28.    Defendant Deighton has served as a Company director since May 2016. Defendant Deighton also serves as Chair of the Audit and Risk Committee and as a member of the Compensation Committee. Defendant Deighton received compensation from the Company in 2023 totaling $314,959. As of March 31, 2024, Defendant Deighton beneficially owned 35,427 shares of Class A Block common stock, worth approximately $2.9 million.

**Defendant Garutti**

29.    Defendant Garutti has served as a Company director since July 2017. He also serves as Chair of the Nominating and Corporate Governance Committee. Defendant Garutti received compensation from the Company in 2023 totaling $299,959. As of March 31, 2024, Defendant Garutti beneficially owned 23,843 shares of Class A Block common stock, worth approximately $1.9 million.

**Defendant McKelvey**

30.    Defendant McKelvey is a co-founder of the Company and has also served as a Company director since July 2009. Defendant McKelvey received compensation from the Company in 2023 totaling $289,720. As of March 31, 2024, Defendant McKelvey

Verified Shareholder Derivative Complaint

beneficially owned 131,527 shares of Class A Block common stock, worth approximately $10.7 million.

**Defendant Meeker**

31.    Defendant Meeker has served as a Company director since June 2011. She also serves as Chair of the Compensation Committee. Defendant Meeker received compensation from the Company in 2023 totaling $304,642. As of March 31, 2024, Defendant Meeker beneficially owned 413,177 shares of Class A Block common stock, worth approximately $33.7 million.

**Defendant Narula**

32.    Defendant Narula has served as a Company director since July 2023. She also serves as a member of the Audit and Risk Committee and the Nominating and Corporate Governance Committee. Defendant Narula received compensation from the Company in 2023 totaling $236,125. As of March 31, 2024, Defendant Narula beneficially owned 297 shares of Class A Block common stock, worth approximately $24,948.

**Defendant Summers**

33.    Defendant Summers served as a Company director from June 2011 until February 2024. Defendant Summers received compensation from the Company in 2023 totaling $299,959.

**Defendant Viniar**

34.    Defendant Viniar served as a Company director from October 2013 until he resigned on June 14, 2022. Defendant Viniar received compensation from the Company in 2021 totaling $382,102.

**Defendant Walker**

35.    Defendant Walker served as a Company director from June 2020 until he resigned in August 2023. Defendant Walker received compensation from the Company in 2023 totaling $290,243.

**Defendant Rothstein**

Verified Shareholder Derivative Complaint

36.     Defendant Rothstein served as a Company director from January 2022 until June 2023. Defendant Rothstein received compensation from the Company in 2023 totaling $294,959.

**Defendant Patterson**

37.     Defendant Patterson served as a Company director from November 2017 until she resigned on June 14, 2022. Defendant Patterson received compensation from the Company in 2021 totaling $302,565.

**Defendant Ahuja**

38.     Defendant Ahuja has served as the Company's CFO since January 2019 and as its Chief Operating Officer since February 2023. Defendant Ahuja received compensation from the Company in 2023 totaling $16,548,981. As of March 31, 2024, Defendant Ahuja beneficially owned 330,711 shares of Class A Block common stock, worth approximately $27 million.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

39.     By reason of their positions as controlling shareholder, officers, directors, and/or fiduciaries of Block and because of their ability to control the business and corporate affairs of Block, the Individual Defendants owed Block and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Block in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Block and its shareholders so as to benefit all shareholders equally.

40.     Each controlling shareholder, director, and officer of the Company owes to Block and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

41.     The Individual Defendants, because of their positions of control and authority as controlling shareholder, directors, and/or officers of Block, were able to and did, directly

Verified Shareholder Derivative Complaint

and/or indirectly, exercise control over the wrongful acts complained of herein.

42. To discharge their duties, the controlling shareholder, officers, and/or directors of Block were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

43. Each Individual Defendant, by virtue of their position as a controlling shareholder, director, and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as controlling shareholder, directors, and/or officers of Block, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also controlling shareholder, officers, and/or directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised the Company's Board at all relevant times.

44. As controlling shareholder, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would

be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

45. To discharge their duties, the controlling shareholder, officers, and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholder, officers, and/or directors of Block were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Block's corporate governance and applicable codes of conduct and/or ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Block conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Block and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Block's operations would comply with all applicable laws and Block's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements

Verified Shareholder Derivative Complaint

made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)   refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)   examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

46.   Each of the Individual Defendants further owed to Block and the shareholders the duty of loyalty requiring that each favor Block's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

47.   At all times relevant hereto, the Individual Defendants were the agents of each other and of Block and were at all times acting within the course and scope of such agency.

48.   Because of their advisory, executive, managerial, directorial, and controlling positions with Block, each of the Individual Defendants had access to adverse, nonpublic information about the Company.

49.   The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Block.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching

13

Verified Shareholder Derivative Complaint

their respective duties.

51.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

52.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Block was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

53.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

54.    At all relevant times hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Block and was at all times acting within the course and scope of such agency.

Verified Shareholder Derivative Complaint

## BLOCK'S CODE OF CONDUCT

55. Block's Code of Business Conduct and Ethics (the "Code of Conduct") states that "[t]he Code is our foundation for how we work. It helps empower everyone who works at Block to understand the responsibilities we have."

56. In the section titled "Financial Integrity & Accurate Records" the Code of Conduct states, in relevant part:

The Integrity of our business practices and financial information is paramount. Accurate, clear and complete records are essential to making the best business decisions, preserving our reputation for financial integrity and meeting our obligations as a public Company. In parallel, our shareholders and the financial markets rely on our full, fair, truthful, timely and understandable disclosures and financial information as well.

57. In the section titled "Speak Up," the Code of Conduct states, in relevant part:

If you have a concern regarding conduct that you believe will be a violation of Company policy including this Code, a violation of law, or questionable accounting practices, internal accounting controls, or other financial matters, or the reporting of fraudulent financial information, you should speak up. No matter how small the issue is, Block wants to hear from you.

58. In the subsection titled "Insider Trading Policy," the Code of Conduct states:

You may not trade or enable others to trade Block stock or stock of another company, such as a customer, supplier, competitor, potential acquisition target or alliance, while in possession of MNPI about that company. Insider trading not only violates this Code, it also violates the law and can result in criminal consequences. Any questions as to whether information is material or has been adequately disclosed should be directed to insider@. Please review Block's Insider Trading Policy, which explains the risks of insider trading and trading windows when you may not trade Block stock.

59. In the section titled "Comply with Applicable Laws, Regulations, & Policies" the Code of Conduct states, in relevant part:

Competing vigorously, yet lawfully, with competitors and establishing advantageous, but far, business relationships with customers and suppliers is

a part of the foundation for long-term success. That being said, unlawful and unethical conduct, which may lead to short-term gains, would damage Block's reputation and long-term business prospects.

\* \* \*

While working on behalf of Block, you must adhere to the Block Global Sanctions Compliance Policy, which restricts you from providing services in violation of local sanctions law.

\* \* \*

You must avoid conflicts of interest, and if there is a situation that could present a potential conflict, or the appearance of conflict, you must disclose it to Block through the available channels below, so that it can be evaluated.

60.    In violation of the Code of Conduct, the Individual Defendants (as key officers and as members of the Company's Board) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to issue materially false and misleading statements to the public and to cause the Company to engage in the Customer Misconduct, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, and aiding and abetting thereof.  Also in violation of the Code of Conduct, the Individual Defendants failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## BLOCK'S AUDIT COMMITTEE CHARTER

61.    Block also maintains an Audit Committee Charter (the "Audit Committee Charter") which governs the Audit Committee's roles and responsibilities. The Audit Committee Charter states the following regarding the purpose of the Audit Committee:

The purpose of the Audit and Risk Committee (the "Audit and Risk Committee") of the Board of Directors (the "Board") of Block, Inc., a Delaware corporation (the "Company"), is to assist the Board in overseeing:

• The Company's accounting and financial reporting processes and internal controls as well as the auditing and integrity of the Company's financial statements.

• The qualifications and independence of the Company's independent

Verified Shareholder Derivative Complaint

registered public accounting firm (the "Independent Auditor").

• The performance of the Company's Independent Auditor and internal audit function.

• The Company's compliance with applicable law (including U.S. federal securities laws and other legal and regulatory requirements).

• Risk assessment and risk management pertaining to the financial, accounting and tax matters as well as data privacy and cybersecurity needs of the Company.

62.    Under the section titled "Review Financial Statements," the Audit Committee Charter states that the Audit and Risk Committee shall review the following with management and the Independent Auditor:

- The scope and timing of the annual audit of the Company's financial statements.

- The Company's annual audited and quarterly financial statements and annual and quarterly reports on Form 10-K and 10-Q, including the disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations."

- The results of the independent audit and the quarterly reviews, and the Independent Auditor's opinion on the annual financial statements.

- The reports and certifications regarding internal control over financial reporting and disclosure controls and procedures.

- Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Company's selection or application of accounting principles.

- Analyses prepared by management or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements.

- The effect of regulatory and accounting initiatives on the Company's financial statements.

- Any significant changes required or taken in the audit plan as a result of any material control deficiency.

Verified Shareholder Derivative Complaint

63.    The Audit Committee Charter states that it "shall review and discuss (with particular attention to any use of non-GAAP financial measures) the Company's earnings press releases, shareholder letters, and financial information and earnings guidance provided to the public, analysts, and ratings agencies."

64.    Under the section titled "Internal Controls" the Audit Committee Charter states the following:

    i.    The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the adequacy and effectiveness of the Company's internal controls, including any changes, significant deficiencies or material weaknesses in those controls reported by the Independent Auditor or management, any special audit steps adopted in light of significant control deficiencies, and any fraud, whether or not material, that involves management or other Company employees who have a significant role in the Company's internal controls.

65.    Under the section titled "Legal and Regulatory Compliance," the Audit Committee Charter states the following:

• Oversee the review of any complaints and submissions that have been brought to the Audit and Risk Committee by the Company's Chief Legal Officer or Chief Compliance Officer (or equivalent titles thereof) under the Company's Code of Business Conduct and Ethics (the "Code");

• Review and discuss with management and the Independent Auditor (i) the overall adequacy and effectiveness of the Company's legal, regulatory and ethical compliance programs, including compliance with the Foreign Corrupt Practices Act and foreign anti-corruption laws, and compliance with export control regulations, (ii) any reports received through the Company's reporting hotline and (iii) reports regarding compliance with applicable laws, regulations and internal compliance programs in each case to the extent pertaining to financial, accounting and/or tax matters;

• Discuss with management and the Independent Auditor any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies; and

• Discuss with the Company's Chief Legal Officer legal matters that may have a material impact on the financial statements or the Company's compliance

Verified Shareholder Derivative Complaint

procedures that pertain to financial, accounting or tax matters of the Company.

66.    Under the section titled "Risk" the Audit Committee Charter states the following:

> The Audit and Risk Committee shall review and discuss with management and the Independent Auditor the Company's major financial and other risk exposures, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, the Company's programs, policies relating to legal and regulatory compliance, and operational security and reliability, and the steps management has taken to monitor and control those exposures, including the Company's guidelines and policies with respect to risk assessment and risk management. The Audit and Risk Committee will also review the Company's risk management framework, programs, and policies, as well as the framework by which management discusses the Company's risk profile and risk exposures with the Board and its committees.

67.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in the Customer Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

68.    Block was founded in 2009 and uses financial technology to facilitate payment solutions. Block offers two primary products: Square and Cash App. Square utilizes smart phones to process credit card transactions for small and medium-sized

Verified Shareholder Derivative Complaint

businesses, while Cash App offers multiple services including debit cards, tax filing, investing in stocks and bitcoin, savings accounts and money transfers.

69.    Block is known for allowing its platforms to have a low barrier of entry, especially when reaching the unbanked community. On the Company's website, it states: "Equity and access are essential to our shared purpose of economic empowerment at Block across our ecosystem, we make simple tools to help create more equitable and inclusive financial services."

70.    The blockchain is a decentralized public ledger that allows users to send bitcoin transactions. Bitcoin transactions on the blockchain provide a higher degree of anonymity compared to other types of banking transactions. The bitcoin transactions on the blockchain are labeled through a randomly generated string of characters associated with a particular digital wallet on the blockchain. It is crucial for platforms accepting bitcoin transactions to have strong due diligence practices in place to ensure user identity as well as to monitor transactions to ensure the transactions are not associated with unlawful practices.

71.    Since Cash App began to accept bitcoin transactions in 2018, Block experienced massive growth. Indeed, Block's revenues grew from $1.31 billion in 2019 to $21.92 billion in 2023. However, unbeknownst to investors, the Company's explosive growth was primarily caused by Block's lack of internal controls to effectively monitor fraud and other illegal activity, which attracted criminals to use the Company's platforms for their illegal activities.

### The Customer Misconduct

72.    During the Relevant Period, the Individual Defendants ignored red flags that Block's platforms were being used for illegal acts and "***deprived Cash App users of meaningful and effective customer service and left the network vulnerable to criminals defrauding users.***"[3] Indeed, "***[c]onsumers looking for an alternate route to Cash App***

---

[3] All emphasis has been added unless otherwise noted herein.

*customer service through web searches were targeted by fraudsters posing as Cash App representatives, who tricked them into giving up their passwords and other personal information. Block knew that its customers were being targeted by fraudsters in this way but failed to take timely action to address the issue.*"

73.    As the CFPB later reported:

*"Cash App created the conditions for fraud to proliferate on its popular payment platform,"* said CFPB Director Rohit Chopra. *"When things went wrong, Cash App flouted its responsibilities and even burdened local banks with problems that the company caused."*

***

*Cash App attempted to avoid many of its investigative obligations through tricking consumers with its Terms of Service.* For example, many Cash App users link their bank account to the app. When a transaction occurs, the money is pulled from the user's bank account and sent to the transaction recipient. In Cash App's Terms of Service, consumers are led to believe that disputes are the responsibility of their linked bank. The Electronic Fund Transfer Act generally requires that peer-to-peer platforms, including Cash App, investigate disputes of unauthorized transactions, and a company cannot simply use fine print to escape these legal requirements. *When it did conduct investigations, Block used intentionally shoddy investigation practices to close reports of unauthorized transactions in the company's favor.*

*Block also deprived Cash App users of meaningful and effective customer service and left the network vulnerable to criminals defrauding users.* While Block included a telephone number on the back of its Cash Card and in its Cash App Terms of Service, for many years this telephone number did not connect consumers to customer support of any type. Instead, it led to a pre-recorded message directing consumers to contact customer support through the app. Consumers could only contact Block through the app or through U.S. mail and were often met with delayed, inadequate, confusing, or inaccurate responses. *Consumers looking for an alternate route to Cash App customer service through web searches were targeted by fraudsters posing as Cash App representatives, who tricked them into giving up their passwords and other personal information. Block knew that its customers were being targeted by fraudsters in this way but failed to take timely action to address the issue.*

Verified Shareholder Derivative Complaint

**FALSE AND MISLEADING STATEMENTS**

*February 26, 2020 Shareholder Letter and Form 10-K*

74.    The Relevant Period began on February 26, 2020 when the Company issued a shareholder letter announcing its fourth quarter ("4Q19") and full-year 2019 financial results (the "2019 Letter"), which was signed by Defendants Dorsey and Ahuja. In the 2019 Letter, the Company reported that, for 4Q19, the Company achieved 41% year-over-year total net revenue growth and 39% year-over-year gross profit growth, reaching $1.31 billion in net revenue and $527 million in gross profit. Similarly, with respect to its full-year 2019 results, the Company reported in the 2019 Letter that it had achieved $4.71 billion in revenues and $1.89 billion in gross profit, which represented 43% and 45% in year-over-year growth, respectively. The 2019 Letter also reported on the Company's Square and Cash App segments. Indeed, with respect to the Square segment, the 2019 Letter represented that, for 4Q19, the Company achieved 26% year-over-year revenue growth to $938 million and 27% year-over-year gross profit growth to $379 million. In addition, the 2019 Letter reported that the Cash App segment had accomplished 147% and 104% year-over-year growth in revenue and gross profit, respectively, during 4Q19, reaching $362 million in revenue and $144 million in gross profit. The 2019 Letter also reported that Cash App had approximately 24 million monthly active customers in December 2019, representing 60% year-over-year growth.

75.    The same day, the Company filed its annual report on Form 10-K with the SEC for 2019 (the "2019 10-K"), which was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Patterson, Summers, and Viniar and contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Dorsey and Ahuja attesting to its accuracy.

76.    The 2019 10-K reiterated the financial results reported in the 2019 Letter. The 2019 10-K also represented that the Company had established and implemented a "compliance program focused on the laws, rules, and regulations applicable to [its]

business" and that the Company and its employees "vet and monitor [the Company's] customers and the payments transactions we process for them as part of our risk management efforts.

77.    The 2019 10-K further stated the following with respect to the Company's procedures for complying with anti-money laundering ("AML") laws and regulations:

*We are subject to anti-money laundering (AML) laws and regulations in the United States and other jurisdictions.* ***We have implemented an AML program designed to prevent our payments network from being used to facilitate money laundering, terrorist financing, and other illicit activity. Our program is also designed to prevent our network from being used to facilitate business in countries, or with persons or entities, included on designated lists promulgated by the U.S. Department of the Treasury's Office of Foreign Assets Controls and equivalent applicable foreign authorities. Our AML compliance program includes policies, procedures, reporting protocols, and internal controls, including the designation of an AML compliance officer, and is designed to address these legal and regulatory requirements and to assist in managing risk associated with money laundering and terrorist financing.***

***May 6, 2020 Shareholder Letter and Form 10-Q***

78.    On May 6, 2020, the Company announced its financial results for the first quarter of 2020 by issuing a shareholder letter (the "1Q20 Letter"), which was signed by Defendants Dorsey and Ahuja. The 1Q20 Letter represented that Block had achieved 44% and 36% year-over-year growth, respectively, in net revenue and gross profits for the quarter, to reach $1.38 billion in total net revenue and $539 million in gross profits. The 1Q20 Letter also stated that: (1) Square achieved 16% and 18% year-over-year growth in revenues and gross profits, respectively, to reach $853 million in revenue and $356 million in gross profit for the quarter; and (2) Cash App achieved 197% and 115% year-over-year growth in revenues and gross profits, respectively, to reach $528 million in revenue and $183 million in gross profit for the quarter. In addition, the 1Q20 Letter stated that, in April, "Cash App delivered strong revenue and gross profit growth year over year, and achieved its highest monthly totals for net-new transacting active customers, peer-to-peer volumes,

Verified Shareholder Derivative Complaint

Cash Card spend, Cash Card orders, direct deposit transacting active customers, bitcoin volumes, stock brokerage volumes, and stored funds."

79.    The same day, the Company filed its quarterly report Form 10-Q for the first quarter of 2020 with the SEC (the "1Q20 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 1Q20 10-Q contained the same financial and operating information about the Company as set forth in the 1Q20 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

### August 4, 2020 Shareholder Letter and August 5, 2020 Form 10-Q

80.    On August 4, 2020, the Company announced its second quarter results by issuing a shareholder letter (the "2Q20 Letter"), which was signed by Defendants Dorsey and Ahuja. The 2Q20 Letter represented that Block had achieved 64% and 28% year-over-year growth, respectively, in total net revenue and gross profits for the quarter, to reach $1.92 billion in total net revenue and $597 million in gross profits. The 2Q20 Letter also stated that: (1) Square achieved $723 million in quarterly revenue and $316 million in gross profit for the quarter; and (2) Cash App achieved 361% and 167% year-over-year growth in revenues and gross profits, respectively, to reach $1.2 billion in revenue and $281 million in gross profit for the quarter. In addition, the 2Q20 Letter stated that, in June, "Cash App had more than 30 million monthly transacting active customers, with more than 7 million spending on Cash Card."

81.    The following day, the Company filed its quarterly report Form 10-Q for the second quarter of 2020 with the SEC (the "2Q20 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 2Q20 10-Q contained the same financial and operating information about the Company as set forth in the 2Q20 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

### November 5, 2020 Shareholder Letter and Form 10-Q

Verified Shareholder Derivative Complaint

82.    On November 5, 2020, the Company announced its third quarter results by issuing a shareholder letter (the "3Q20 Letter"), which was signed by Defendants Dorsey and Ahuja. The 3Q20 Letter represented that Block had achieved 140% and 59% year-over-year growth, respectively, in total net revenue and gross profits for the quarter, to reach $3.03 billion in total net revenue and $794 million in gross profits. The 3Q20 Letter also stated that: (1) Square achieved 5% year-over-year revenue growth to $965 million and 12% year-over-year gross profit growth to $409 million; and (2) Cash App achieved 574% year-over-year revenue growth to $2.07 billion and 212% year-over-year gross profit growth to $385 million. In addition, the 3Q20 Letter stated that, in the third quarter of 2020, "the number of average daily transacting active Cash App customers nearly doubled from the same period last year."

83.    The same day, the Company filed its quarterly report Form 10-Q for the third quarter of 2020 with the SEC (the "3Q20 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 3Q20 10-Q contained the same financial and operating information about the Company as set forth in the 3Q20 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

### January 4, 2021 Press Release

84.    The Company issued a press release on January 4, 2021, opposing a proposed rule by the U.S. Department of the Treasury's Financial Enforcement Network that would require companies processing cryptocurrency transactions to have stronger due diligence requirements. The press release emphasized that financial systems should be easily accessible by all and that the proposed rule was "unnecessary". The press release further stated that "private sector solutions and companies" were capable of mitigating such risks and the proposed rule would actually increase unlawful activities.

### February 23, 2021 Shareholder Letter and Form 10-K

85.    On February 23, 2021, the Company issued a shareholder letter announcing

Verified Shareholder Derivative Complaint

its full year and fourth quarter 2020 financial results (the "4Q20 Letter"), which was signed by Defendants Dorsey and Ahuja. The 4Q20 Letter represented that Block had achieved 141% and 52% year-over-year growth, respectively, in total net revenue and gross profits for the quarter, to reach $3.16 billion in total net revenue and $804 million in gross profits. In addition, the 4Q20 Letter stated that, for the year, Block achieved 101% year-over-year total net revenue growth to $9.5 billion and 45% year-over-year gross profit growth to $2.73 billion. The 4Q20 Letter also stated that: (1) Square achieved 5% year-over-year revenue growth to $987 million and 13% year-over-year gross profit growth to $427 million in the quarter; and (2) Cash App achieved 502% year-over-year revenue growth to $2.17 billion and 162% year-over-year gross profit growth to $377 million in the quarter. In addition, the 4Q20 Letter stated that "Cash App continued to drive strong acquisition of new customers and retain its existing base: In December, Cash App had more than 36 million monthly transacting active customers, up more than 50% year over year."

86. On the same day, the Company filed its annual report on Form 10-K with the SEC for 2020, which was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Patterson, Summers, Viniar, and Walker and contained substantially the same false and misleading statements as the 2019 10-K as discussed above (the "2020 10-K"). In addition, the 2020 10-K contained the same financial results as set forth in the 4Q20 Letter. The 2020 10-K also attached SOX certifications signed by Defendants Dorsey and Ahuja attesting to its accuracy.

*May 6, 2021 Shareholder Letter and Form 10-Q*

87. On May 6, 2021, the Company issued a shareholder letter announcing its first quarter 2021 financial results (the "1Q21 Letter"), which was signed by Defendants Dorsey and Ahuja. The 1Q21 Letter represented that Block achieved 266% year-over-year total net revenue growth to $5.06 billion and 79% year-over-year gross profit growth to $964 million. The 1Q21 Letter also stated that: (1) Square achieved 19% year-over-year revenue growth to $1.02 billion and 32% year-over-year gross profit growth to $468 million in the

quarter; and (2) Cash App achieved 666% year-over-year revenue growth to $4.04 billion and 171% year-over-year gross profit growth to $495 million in the quarter. In addition, the 1Q21 Letter stated that "We continued to drive acquisition of net-new transacting active Cash App customers as well as engagement with Cash Card, Boost, direct deposit, stock brokerage, bitcoin investing, and business accounts."

88.    The same day, the Company filed its quarterly report Form 10-Q for the first quarter of 2021 with the SEC (the "1Q21 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 1Q21 10-Q contained the same financial and operating information about the Company as set forth in the 1Q21 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

*August 1, 2021 Shareholder Letter and August 2, 2021 Form 10-Q*

89.    On August 1, 2021, the Company issued a shareholder letter announcing its second quarter 2021 financial results (the "2Q21 Letter"), which was signed by Defendants Dorsey and Ahuja. The 2Q21 Letter represented that, for the quarter, Block achieved 143% year-over-year total net revenue growth to $4.68 billion and 91% year-over-year gross profit growth to $1.14 billion. The 2Q21 Letter also stated that: (1) Square achieved 81% year-over-year revenue growth to $1.31 billion and 85% year-over-year gross profit growth to $585 million; and (2) Cash App achieved 177% year-over-year revenue growth to $3.33 billion and 94% year-over-year gross profit growth to $546 million. In addition, the 2Q21 Letter stated that, for the second quarter, "volume sent through Cash App's network increased by nearly 4x compared to two years ago, driven by growth in existing customers and newer customers transacting more frequently."

90.    The following day, the Company filed its quarterly report Form 10-Q for the second quarter of 2021 with the SEC (the "2Q21 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 2Q21 10-Q contained the same financial and operating information about the Company as set forth in the 2Q21 Letter and reiterated substantially the same

misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

### November 4, 2021 Shareholder Letter and Form 10-Q

91.     On November 4, 2021, the Company issued a shareholder letter announcing its third quarter 2021 financial results (the "3Q21 Letter"), which was signed by Defendants Dorsey and Ahuja. The 3Q21 Letter represented that, for the quarter, Block achieved 27% year-over-year total net revenue growth to $3.84 billion and 43% year-over-year gross profit growth to $1.13 billion. The 3Q21 Letter also stated that: (1) Square achieved 44% year-over-year revenue growth to $1.39 billion and 48% year-over-year gross profit growth to $606 million; and (2) Cash App achieved 16% year-over-year revenue growth to $2.39 billion and 33% year-over-year gross profit growth to $512 million. In addition, the 3Q21 Letter stated: "In October, we expect Cash App to deliver strong gross profit growth year over year and on a two-year CAGR basis driven by growth in monthly actives, engagement across our ecosystem, and inflows into Cash App."

92.     The same day, the Company filed its quarterly report Form 10-Q for the third quarter of 2021 with the SEC (the "3Q21 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 3Q21 10-Q contained the same financial and operating information about the Company as set forth in the 3Q21 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

### February 24, 2022 Shareholder Letter and Form 10-K

93.     On February 24, 2022, the Company issued a shareholder letter announcing its fourth quarter and full year 2021 financial results (the "4Q21 Letter"), which was signed by Defendants Dorsey and Ahuja. The 4Q21 Letter represented that Block had achieved 29% and 47% year-over-year growth in total net revenue and gross profits, respectively, for the quarter, to reach $4.08 billion in total net revenue and $1.18 billion in gross profits. In addition, the 4Q21 Letter stated that, for the year, Block achieved 86% year-over-year

Verified Shareholder Derivative Complaint

total net revenue growth to $17.66 billion and 62% year-over-year gross profit growth to $4.42 billion. The 4Q21 Letter also stated that: (1) Square achieved 49% year-over-year revenue growth to $1.47 billion and 54% year-over-year gross profit growth to $657 million in the quarter; and (2) Cash App achieved 18% year-over-year revenue growth to $2.55 billion and 37% year-over-year gross profit growth to $518 million in the quarter. In addition, the 4Q21 Letter stated that "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

94.    On the same day, the Company filed its annual report on Form 10-K with the SEC for 2021, which was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Patterson, Rothstein, Summers, Viniar, and Walker and contained substantially the same false and misleading statements as the 2019 10-K as discussed above (the "2021 10-K"). In addition, the 2021 10-K contained the same financial results as set forth in the 4Q21 Letter. The 2021 10-K also attached SOX certifications signed by Defendants Dorsey and Ahuja attesting to its accuracy.

95.    Also on February 24, 2024, the Company hosted a conference call with analysts and investors to discuss its results. During the call, Defendant Dorsey represented to investors that the Company was focused on preventing fraud on Cash App, stating the following, in relevant part:

*I'll say that I think our biggest constraint right now is just how we think about building Cash App's risk and compliance efforts, everything that we see around fraud. We want to make sure that we are building a system that is scalable, that allows for limits for customers who might have more resources at their disposal and want to use Cash App for more and more things such as – as they would treat their normal bank.*

*So we have limits in place to manage all these things, and a big goal for us is to make sure that we're looking for opportunities to increase those and to, at the same time, maintain all of the risk controls and fraud and continue to do what we've done so well over the years. And not just on the Cash App side, but on the Square side, keep it in our business forever.*

*April 28, 2022 Proxy Statement*

96. On April 28, 2022, the Company filed a Schedule 14A with the SEC (the "2022 Proxy Statement"). Defendants Dorsey, Deighton, Botha, Brooks, McKelvey, Garutti, Meeker, Rothstein, Summers, and Walker solicited the 2022 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

97. The 2022 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, re-elect Defendants Deighton and Dorsey to the Board.

98. Regarding the Board's role with respect to "Risk Management," the 2022 Proxy Statement stated:

> Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk aware and accountable organization. The oversight responsibility of our board of directors and its committees is enabled by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meets with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures and escalates potential issues to our audit and risk committee or board of directors, as appropriate.

> As part of our overall risk management process, we conduct an Enterprise Risk Assessment ("ERA") on an annual basis, which is shared and discussed with our board of directors. The oversight of the ERA is supported and enabled by our audit and risk committee. In addition, our board of directors' responsibilities related to oversight of the ERA framework include a routine evaluation of the processes, as well as discussions with key management and representatives of outside advisors as appropriate, used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. These primary risk focus areas are defined by the board of directors, management and leaders of our ERA review

Verified Shareholder Derivative Complaint

as strategic, operational, people, financial and compliance and consist of risks such as cybersecurity, financial reporting and competition.

While our board of directors maintains ultimate responsibility for the oversight of risk, it has implemented a multi-layered approach which delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are thoroughly discussed and that a pervasive understanding of such focus areas is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas in the future.

99. Regarding the Code of Conduct, the 2022 Proxy Statement stated the following, in relevant part:

Our board of directors has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates, including independence standards and corporate governance policies and standards applicable to us in general. In addition, our board of directors has adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors, including our Block Head, Chief Financial Officer and other executive and senior financial officers. The full text of our Corporate Governance Guidelines and our Code of Business Conduct and Ethics is posted on our investor relations website at https://investors.block.xyz. We will post amendments to our Corporate Governance Guidelines and our Code of Business Conduct and Ethics or any waivers of our Code of Business Conduct and Ethics for directors and executive officers on the same website.

100. The 2022 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*, that: (1) the Company failed to monitor the nature of the transactions that were being processed on its platforms and lacked due diligence practices; (2) the Company became a hotbed to facilitate illegal activities by imposing minimal obligations on users seeking to open accounts and encouraging the use of bitcoin on its platforms; (3) Company management disregarded signs that their platforms were being used for unlawful and unethical activities; and (4) as a result, the Company was facing

31

Verified Shareholder Derivative Complaint

damage to its reputation and possible regulatory risk. As a result of the foregoing, the Company's statements concerning its business, prospects, and operations were materially misleading and lacked a reasonable basis at all relevant times.

101. The 2022 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein and to engage in the Customer Misconduct; and (2) failing to report violations of the Code of Conduct. Further, the 2022 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

102. As a result of Defendants Dorsey, Deighton, Botha, Brooks, McKelvey, Garutti, Meeker, Rothstein, Summers, and Walker causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Dorsey and Deighton to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

### *May 5, 2022 Shareholder Letter and Form 10-Q*

103. On May 5, 2022, the Company announced its first quarter results by issuing a shareholder letter (the "1Q22 Letter"), which was signed by Defendants Dorsey and Ahuja. The 1Q22 Letter represented that, for the quarter, Block achieved total net revenue of $3.96 billion, which was down 22% year-over-year as a result of a decrease in bitcoin revenue, and gross profit growth of 34% to $1.29 billion. The 1Q22 Letter also stated that: (1) Square achieved 42% year-over-year revenue growth to $1.44 billion and 41% year-over-year gross profit growth to $661 million; and (2) Cash App achieved $2.46 billion in revenue and gross profit growth of 26% to $624 million. In addition, the 1Q22 Letter stated: "We are focused on expanding our customers' awareness and access to bitcoin, which has allowed us to drive meaningful adoption: As of the end of the first quarter, more than 10

million Cash App accounts have bought bitcoin since the product was introduced."

104.   The same day, the Company filed its quarterly report Form 10-Q for the first quarter of 2022 with the SEC (the "1Q22 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 1Q22 10-Q contained the same financial and operating information about the Company as set forth in the 1Q22 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

***August 4, 2022 Shareholder Letter***

105.   On August 4, 2022, the Company announced its second quarter results by issuing a shareholder letter (the "2Q22 Letter"), which was signed by Defendants Dorsey and Ahuja. The 2Q22 Letter represented that, for the quarter, Block achieved total net revenue of $4.4 billion, which was down 6% year-over-year as a result of a decrease in bitcoin revenue, and gross profit growth of 29% to $1.47 billion. The 2Q22 Letter also stated that: (1) Square achieved 32% year-over-year revenue growth to $1.73 billion and 29% year-over-year gross profit growth to $755 million; and (2) Cash App achieved $2.62 billion in revenue and gross profit growth of 29% to $705 million. In addition, the 2Q22 Letter stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem, such that overall inflows grew quarter over quarter and year over year."

106.   The same day, the Company filed its quarterly report Form 10-Q for the second quarter of 2022 with the SEC (the "2Q22 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 2Q22 10-Q contained the same financial and operating information about the Company as set forth in the 2Q22 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

***November 3, 2022 Shareholder Letter***

107.   On November 3, 2022, the Company announced its third quarter financial

Verified Shareholder Derivative Complaint

results by issuing a shareholder letter (the "3Q22 Letter"), which was signed by Defendants Dorsey and Ahuja. The 3Q22 Letter represented that, for the quarter, Block achieved 17% year-over-year total net revenue growth to $4.52 billion and 38% year-over-year gross profit growth to $1.57 billion. The 3Q22 Letter also stated that: (1) Square achieved 27% year-over-year revenue growth to $1.77 billion and 29% year-over-year gross profit growth to $783 million; and (2) Cash App achieved 12% year-over-year revenue growth to $2.68 billion and 51% year-over-year gross profit growth to $774 million. In addition, the 3Q22 Letter stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

108. The same day, the Company filed its quarterly report Form 10-Q for the third quarter of 2022 with the SEC (the "3Q22 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 3Q22 10-Q contained the same financial and operating information about the Company as set forth in the 3Q22 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

### February 23, 2023 Shareholder Letter

109. On February 23, 2023, the Company issued a shareholder letter announcing its fourth quarter and full year 2021 financial results (the "4Q22 Letter), which was signed by Defendants Dorsey and Ahuja. The 4Q22 Letter reported that: (1) for the fourth quarter, the Company achieved 14% year-over-year total net revenue growth to $4.65 billion and 40% year-over-year gross profit growth to $1.66 billion; and (2) for the year, the Company achieved $17.53 billion in total net revenue and 36% year-over-year gross profit growth to $5.99 billion. The 4Q22 Letter also stated that: (1) Square achieved 19% year-over-year revenue growth to $1.76 billion and 22% year-over-year gross profit growth to $801 million in the fourth quarter; and (2) Cash App achieved 12% year-over-year revenue growth to $2.68 billion and 64% year-over-year gross profit growth to $848 million in the fourth quarter. In addition, the 4Q22 Letter stated that Block had "ended the year with 51

million monthly transacting activities in December, with two out of three transacting each week on average."

110. On the same day, the Company filed its annual report on Form 10-K with the SEC for 2022, which was signed by Defendants Dorsey, Ahuja, Botha, Brooks, Deighton, Garutti, McKelvey, Meeker, Rothstein, Summers, and Walker and contained substantially the same false and misleading statements as the 2019 10-K as discussed above (the "2022 10-K"). In addition, the 2022 10-K contained the same financial results as set forth in the 4Q22 Letter. The 2022 10-K also attached SOX certifications signed by Defendants Dorsey and Ahuja attesting to its accuracy.

111. The statements in ¶¶74-95 and ¶¶103-110 above were materially false and misleading and failed to disclose, *inter alia*, that: (i) the Individual Defendants failed to monitor the nature of transactions that were being processed on its platforms and lacked due diligence practices; (ii) the Company became a hotbed to facilitate illegal activities by imposing minimal obligations on users seeking to open accounts and encouraging the use of bitcoin on its platforms; (iii) the Company's management disregarded signs that their platforms were being used for unlawful and unethical activities; (iv) the Company's platforms were vulnerable to identify fraud since users could open multiple accounts using fake identities; (v) Block allowed users to withdraw funds even though there was suspicion of illegal activity; and (vi) the reported number of accounts on financial statements was inflated due to fake accounts and users having the ability to open multiple accounts. As a result of the foregoing, Defendants' positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

### The Truth Starts Emerging as the False and Misleading Statements Continue

#### *The Hindenburg Report*

112. On March 23, 2023, Hindenburg Research published a report titled "Block:

How Inflated User Metrics and 'Frictionless' Fraud Facilitation Enabled Insiders to Cash Out Over $1 Billion" (the "Hindenburg Report"). The Hindenburg Report emphasized the Company's lack of regard for its compliance obligations and called Cash App the "Wild West." The Hindenburg Report noted that the "magic" of the Company's success was a result of "the company's willingness to facilitate fraud against consumers and the government, avoid regulation, dress up predatory loans and fees as revolutionary technology, and mislead investors with inflated metrics." It also emphasized that the Company's rampant compliance failures made it "easy for bad actors to mass-create accounts for identity fraud and other scams, then extract stolen funds quickly."

113.    The Hindenburg Report detailed how Cash App users were able to use the app to engage in, *inter alia*, identity fraud, drug trafficking, consumer scams, sex trafficking, contract killings, and COVID-19 relief fraud. The Hindenburg Report also contained interviews with former Block employees who stated that Block was ignoring user complaints and internal concerns about criminal and fraudulent activity. In addition, it stated: "Cash App's embrace of non-compliance begins by making it easy for users to get on the platform, easy for them to get back on the platform if their accounts are closed, and easy to remain anonymous or operate under blatantly false identities."

114.    On this news, Block's stock price fell $10.77 per share, or about 15%, from a closing price of $72.65 per share on March 22, 2023, to close at $61.88 per share on March 23, 2023. Still, despite this partial emergence of the truth, Defendants continued to actively mislead investors regarding, *inter alia*, the issues plaguing Cash App. Indeed, in the hours following the publication of the Hindenburg Report, the Company issued a press release stating:

> ***We intend to work with the SEC and explore legal action against Hindenburg Research for the factually inaccurate and misleading report they shared about our Cash App business today.***
>
> Hindenburg is known for these types of attacks, which are designed solely to

allow short sellers to profit from a declined stock price. ***We have reviewed the full report in the context of our own data and believe it's designed to deceive and confuse investors.***

***We are a highly regulated public company with regular disclosures, and are confident in our products, reporting, compliance programs, and controls*** will not be distracted by typical short seller tactics.

***April 28, 2023 Proxy Statement***

115.    On April 28, 2023, the Company filed a Schedule 14A with the SEC (the "2023 Proxy Statement"). Defendants Botha, Brooks, McKelvey, Garutti, Meeker, Rothstein, Summers, Walker, Dorsey, and Deighton solicited the 2023 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

116.    The 2023 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, re-elect Defendants Botha, Brooks, and McKelvey to the Board.

117.    Regarding the Board's role with respect to "Risk Management," the 2023 Proxy Statement stated:

Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization. The oversight responsibility of our board of directors and its committees is supported by management reporting processes that are designed to provide visibility to our board of directors regarding the identification, assessment and management of risks and management's strategic approach to risk mitigation. Our Lead Independent Director and Chair of our audit and risk committee meet with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures, and escalate potential issues to our audit and risk committee or board of directors, as appropriate.

As part of our overall risk management process, we conduct an annual Enterprise Risk Assessment ("ERA"), which is shared and discussed with our board of directors. Oversight of the ERA is supported and enabled by our audit and risk committee. Our board of directors' oversight of the ERA framework includes a routine evaluation, with discussions with key management and

outside advisors, as appropriate, of the processes used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. Our board of directors, management and functional leaders of our ERA define our primary risk focus area for review. These areas include strategic, operational, people, financial and compliance. We address risks such as cybersecurity, financial reporting and competition within each of these areas.

While our board of directors maintains ultimate responsibility for the oversight of risk, it has implemented a multi-layered approach that delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are discussed in detail and that a full understanding of the applicable risk is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas to its committees in the future.

118. Regarding the Code of Conduct, the 2023 Proxy Statement stated the following, in relevant part:

Our board of directors has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and the responsibilities of members of committees of our board of directors. In addition, our board of directors has adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors, including our Block Head, Chief Financial Officer and other executive and senior financial officers. The full texts of our Corporate Governance Guidelines and our Code of Business Conduct and Ethics are posted on our investor relations website at *https://investors.block.xyz*. We will post amendments to our Corporate Governance Guidelines and our Code of Business Conduct and Ethics and any waivers of our Code of Business Conduct and Ethics for directors and executive officers on the same website.

119. The 2023 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*, that: (1) the Company failed to monitor the nature of the transactions that were being processed on its platforms and lacked due diligence practices;

(2) the Company became a hotbed to facilitate illegal activities by imposing minimal obligations on users seeking to open accounts and encouraging the use of bitcoin on its platforms; (3) Company management disregarded signs that their platforms were being used for unlawful and unethical activities; and (4) as a result, the Company was facing damage to its reputation and possible regulatory risk. As a result of the foregoing, the Company's statements concerning its business, prospects, and operations were materially misleading and lacked a reasonable basis at all relevant times.

120.  The 2023 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein and to engage in the Customer Misconduct; and (2) failing to report violations of the Code of Conduct. Further, the 2023 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

121.  As a result of Defendants Botha, Brooks, McKelvey, Garutti, Meeker, Rothstein, Summers, Walker, Dorsey, and Deighton causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Botha, Brooks, and McKelvey to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

### *May 4, 2023 Shareholder Letter, Form 10-Q, and Conference Call*

122.  On May 4, 2023, the Company announced its first quarter financial results by issuing a shareholder letter (the "1Q23 Letter"), which was signed by Defendants Dorsey and Ahuja. The 1Q23 Letter stated that, for the quarter, Block achieved 26% year-over-year total net revenue growth to $4.99 billion and gross profit growth of 32% to $1.71 billion. The 1Q23 Letter also stated that: (1) Square achieved 15% year-over-year revenue growth to $1.67 billion and 16% year-over-year gross profit growth to $770 million; and

Verified Shareholder Derivative Complaint

(2) Cash App achieved 33% year-over-year revenue growth to $3.27 billion and 49% year-over-year gross profit growth to $931 million. In addition, the 1Q23 Letter stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

123.   The same day, the Company filed its quarterly report Form 10-Q for the first quarter of 2023 with the SEC (the "1Q23 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 1Q23 10-Q contained the same financial and operating information about the Company as set forth in the 1Q23 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

124.   Later that day, the Company hosted an earnings call with investors and analysts to discuss the financial results (the "1Q23 Earnings Call"). During the 1Q23 Earnings Call, Defendant Dorsey responded to an analyst question regarding the Hindenburg Report, stating: "I would say that we stand by our response to the shareholder report. … [Our] regulators trust us as well. So this is a significant focus for us and always has been." Defendant Ahuja responded to the Hindenburg Report analyst question as well, stating:

> Block operates a business that is highly regulated, and our goal is ultimately to expand access to the economy through intuitive financial products. In order to do that, *we must maintain a culture of compliance and responsible risk management, including through investment in programs, processes, controls and teams with deep compliance expertise, prioritizing compliance ultimately helps us drive trust to their customers with regulators and external partners, and that enables us to then develop innovative products responsibly, we have significantly grown our investment in compliance over the last few years.*

### August 3, 2023 Shareholder Letter

125.   On August 3, 2023, the Company announced its financial results for the second quarter of 2023 by issuing a shareholder letter (the "2Q23 Letter"). The 2Q23 Letter

reported that, for the quarter, the Company achieved 26% year-over-year total net revenue growth to $5.53 billion and gross profit growth of 27% to $1.87 billion. In addition it reported that: (1) Square achieved 12% year-over-year revenue growth to $1.93 billion and 18% year-over-year gross profit growth to $888 million; and (2) Cash App achieved 36% year-over-year revenue growth to $3.56 billion and 37% year-over-year gross profit growth to $968 million. The 2Q23 Letter also stated: "We drove growth in net new transacting actives and strong engagement across products in our Cash App ecosystem."

126. The same day, the Company filed its quarterly report Form 10-Q for the second quarter of 2023 with the SEC (the "2Q23 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 2Q23 10-Q contained the same financial and operating information about the Company as set forth in the 2Q23 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

127. The 2Q23 10-Q also disclosed that there was an ongoing investigation by the SEC and DOJ into the Company due to the allegations in the Hindenburg Report.

128. On this news, the Company's stock price fell $10.03, or almost 14%, from a closing price of $73.55 per share on August 3, 2023 to close at $63.52 per share on August 4, 2023. Still, despite the truth continuing to emerge, Defendants continued to make false and misleading statements to investors.

***November 2, 2023 Shareholder Letter***

129. On November 2, 2023, the Company announced its third quarter results by issuing a shareholder letter (the "3Q23 Letter"). The 3Q23 Letter reported that, for the quarter, the Company achieved 24% year-over-year total net revenue growth to $5.62 billion and 21% year-over-year gross profit growth to $1.9 billion. It also reported that: (1) Square achieved 12% year-over-year revenue growth to $1.98 billion and 15% year-over-year gross profit growth to $899 million; and (2) Cash App achieved 34% year-over-year revenue growth to $3.58 billion and 27% year-over-year gross profit growth to $984

million.

130.   The 3Q23 Letter also stated that, for September, "Cash App had 55 million monthly transacting activities, up 11% year over year."

131.   The same day, the Company filed its quarterly report Form 10-Q for the third quarter of 2023 with the SEC (the "3Q23 10-Q"), which was signed by Defendants Dorsey and Ahuja. The 3Q23 10-Q contained the same financial and operating information about the Company as set forth in the 3Q23 Letter and reiterated substantially the same misleading statements as set forth in ¶76 above regarding the Company's compliance, due diligence, and risk management efforts.

132.   The statements in ¶114 and ¶¶122-131 above were materially false and misleading and failed to disclose, *inter alia*, that: (i) the Individual Defendants failed to monitor the nature of transactions that were being processed on its platforms and lacked due diligence practices; (ii) the Company became a hotbed to facilitate illegal activities by imposing minimal obligations on users seeking to open accounts and encouraging the use of bitcoin on its platforms; (iii) the Company's management disregarded signs that their platforms were being used for unlawful and unethical activities; (iv) the Company's platforms were vulnerable to identify fraud since users could open multiple accounts using fake identities; (v) Block allowed users to withdraw funds even though there was suspicion of illegal activity; and (vi) the reported number of accounts on financial statements was inflated due to fake accounts and users having the ability to open multiple accounts. As a result of the foregoing,  Defendants' positive statements concerning the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis at all relevant times.

### *February 16, 2024 NBC News Report*

133.   The truth continued to emerge on February 16, 2024 when *NBC News* reported that federal regulators were investigating allegations by whistleblowers that Cash App failed to perform adequate due diligence on its users, including "no effective procedure to

Verified Shareholder Derivative Complaint

establish the[ir] identity" which enabled the platform to be used for illicit activities (the "February 16 *NBC News* Report"). The February 16 *NBC News* Report alleged that the Company failed to implement proper procedures for identifying user identity and further reported that Cash App was processing transactions with entities under sanction by the U.S. Department of Treasury's Office of Foreign Assets Control, which entities had been known for illegal offshore gambling operations, fraud, and identity theft. The February 16 *NBC News* Report further alleged that the Company was obscuring transactions from its banking partners, therefore making it harder to identify transactions tied to illegal activities, and further reported that the Company pressured its banking partners to not conduct traditional due diligence, thereby allowing the Company to open more accounts and generate additional revenues.

134.  On this news, the Company's stock price fell $4.84 per share, or over 5%, from a closing price of $69.48 per share on February 15, 2024, to close at $65.64 per share on February 16, 2024.

### April 26, 2024 Proxy Statement

135.  On April 26, 2024, the Company filed a Schedule 14A with the SEC (the "2024 Proxy Statement"). Defendants Garutti, Meeker, Dorsey, Deighton, Narula, Botha, Brooks, McKelvey, and Rothstein solicited the 2024 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

136.  The 2024 Proxy Statement called for the Company's shareholders to vote to, *inter alia*, re-elect Defendants Garutti and Meeker to the Board.

137.  Regarding the Board's role with respect to "Risk Management," the 2024 Proxy Statement stated:

> Our board of directors recognizes the oversight of risk management as one of its primary responsibilities and central to maintaining an effective, risk-aware and accountable organization. The oversight responsibility of our board of directors and its committees is supported by management reporting processes that are designed to provide visibility to our board of directors regarding the

43

Verified Shareholder Derivative Complaint

identification, assessment and management of risks and management's strategic approach to risk mitigation. The Chair of our audit and risk committee meets with our Internal Audit Lead, Chief Financial Officer, Chief Compliance Officer and Chief Legal Officer on a regular cadence to identify and discuss risks and exposures, and escalate potential issues to our audit and risk committee or board of directors, as appropriate.

As part of our overall risk management process, we conduct an annual Enterprise Risk Assessment ("ERA"), which is shared and discussed with our board of directors. Oversight of the ERA is supported and enabled by our audit and risk committee. Our board of directors' oversight of the ERA framework includes a routine evaluation, with discussions with key management and outside advisors, as appropriate, of the processes used to identify, assess, monitor and report on risks across the organization and the setting and communication of the organization's implementation and measurement of risk tolerances, limits and mitigation. Our board of directors, management and functional leaders of our ERA define our primary risk focus areas for review. These areas include strategic, operational, people, financial and compliance. We address risks such as cybersecurity, financial reporting and competition within each of these areas.

While our board of directors maintains ultimate responsibility for the oversight of risk, it has implemented a multi-layered approach that delegates certain responsibilities to the appropriate board committees to ensure that these primary areas of focus are discussed in appropriate detail and that a full understanding of the applicable risk is obtained. Our board of directors and its committees oversee risks associated with their respective areas of responsibility, as summarized below. Each board committee meets in executive session with key management personnel and representatives of outside advisors as required or requested. Our board of directors may delegate additional risk areas to its committees in the future.

138. Regarding the Code of Conduct, the 2024 Proxy Statement stated the following, in relevant part:

Our board of directors has adopted Corporate Governance Guidelines that address items such as the qualifications and responsibilities of our directors and director candidates and the responsibilities of members of committees of our board of directors. In addition, our board of directors has adopted a Code of Business Conduct and Ethics that applies to all of our employees, officers and directors, including our Block Head, Chief Financial Officer and other

Verified Shareholder Derivative Complaint

executive and senior financial officers. The full texts of our Corporate Governance Guidelines and our Code of Business Conduct and Ethics are posted on our investor relations website at *https://investors.block.xyz*. We will post amendments to our Corporate Governance Guidelines and our Code of Business Conduct and Ethics and any waivers of our Code of Business Conduct and Ethics for directors and executive officers on the same website.

139.    The 2024 Proxy Statement was materially false and misleading because it failed to disclose, *inter alia*, that: (1) the Company failed to monitor the nature of the transactions that were being processed on its platforms and lacked due diligence practices; (2) the Company became a hotbed to facilitate illegal activities by imposing minimal obligations on users seeking to open accounts and encouraging the use of bitcoin on its platforms; (3) Company management disregarded signs that their platforms were being used for unlawful and unethical activities; and (4) as a result, the Company was facing damage to its reputation and possible regulatory risk. As a result of the foregoing, the Company's statements concerning its business, prospects, and operations were materially misleading and lacked a reasonable basis at all relevant times.

140.    The 2024 Proxy Statement was also materially false and misleading because, despite assertions to the contrary, the Company's Code of Conduct was not followed, as evidenced by the Individual Defendants (1) making and/or causing the Company to make the numerous false and misleading statements and omissions alleged herein and to engage in the Customer Misconduct; and (2) failing to report violations of the Code of Conduct. Further, the 2024 Proxy Statement was materially false and misleading because, despite assertions to the contrary, the Board was not adequately performing its risk oversight functions.

141.    As a result of Defendants Garutti, Meeker, Dorsey, Deighton, Narula, Botha, Brooks, McKelvey, and Rothstein causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Garutti and Meeker to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

Verified Shareholder Derivative Complaint

**THE TRUTH FULLY EMERGES**

*May 1, 2024 NBC News Report*

142.    The truth fully emerged on May 1, 2024 when *NBC News* reported (the "May 1 NBC News Report") that federal regulators were investigating allegations by a former Block employee whistleblower that: (i) Block failed to implement basic due diligence procedures; (ii) thousands of transactions had been processed on Square that involved countries subject to economic sanctions; and (iii) cryptocurrency transactions involving terrorist groups had been processed on Block's platforms. The whistleblower alleged that Block had failed to remedy issues with its compliance program even after being notified, that Block had failed to properly report transactions to U.S. regulatory authorities, and that the compliance violations were widely understood by the Board and senior executives. The whistleblower stated, in regard to the compliance program, that "*[f]rom the ground up, everything in the compliance section is flawed …. It is led by people who should not be in charge of a regulated compliance program.*" The report also stated that customers were permitted to withdraw funds even after having been subject to sanctions alerts.

143.    On this news, the Company's stock price fell $6.16 per share, or over 8%, from a closing price of $73.00 per share on April 30, 2024 to close at $66.84 per share on May 1, 2024.

**SUBSEQUENT DEVELOPMENTS**

144.    On August 1, 2024, the Company filed a Form 10-Q with the SEC, which revealed, *inter alia*, that in July 2024, Block had received a follow-on inquiry from the SEC regarding its alleged compliance failures as described in the Hindenburg Report.

145.    On January 15, 2025, 48 state regulatory agencies announced that Block had agreed to pay $80 million for violations of the Bank Secrecy Act and AML laws. In addition, Block agreed to correct ongoing deficiencies, submit to the review of an independent consultant regarding its compliance lapses, and submit a progress report to the states within nine months.

Verified Shareholder Derivative Complaint

146. On January 16, 2025, Block was ordered by the Consumer Financial Protections Bureau ("CFPB") to refund users up to $120 million and pay a penalty of $55 million to the CFPB victim relief fund because the Company did not have adequate security and fraud protocols on the Cash App platform. The CFPB additionally stated that Block failed to have adequate customer service, which caused users to seek routes to Cash App through web searches, leaving these users vulnerable to fraud by bad actors pretending to be representatives of Cash App. In relevant part, the CFPB found:

> *"Cash App created the conditions for fraud to proliferate on its popular payment platform,"* said CFPB Director Rohit Chopra. *"When things went wrong, Cash App flouted its responsibilities and even burdened local banks with problems that the company caused."*

> Block, Inc. (NYSE: SQ) is a publicly traded corporation whose principal executive offices are in Oakland, California. Block offers multiple digital payments products for businesses and consumers, including the point-of-sale payment system Square and the consumer payment service Cash App. Cash App is one of the largest peer-to-peer payment platforms in the United States, with more than 56 million accounts. It allows consumers to send and receive electronic money transfers; accept direct deposits; and use a prepaid card, Cash Card, to make purchases and ATM withdrawals. Block made approximately $7.5 billion in gross profit in 2023, approximately $4 billion of which was generated by Cash App.

> *Cash App attempted to avoid many of its investigative obligations through tricking consumers with its Terms of Service.* For example, many Cash App users link their bank account to the app. When a transaction occurs, the money is pulled from the user's bank account and sent to the transaction recipient. In Cash App's Terms of Service, consumers are led to believe that disputes are the responsibility of their linked bank. The Electronic Fund Transfer Act generally requires that peer-to-peer platforms, including Cash App, investigate disputes of unauthorized transactions, and a company cannot simply use fine print to escape these legal requirements. *When it did conduct investigations, Block used intentionally shoddy investigation practices to close reports of unauthorized transactions in the company's favor.*

> *Block also deprived Cash App users of meaningful and effective customer service and left the network vulnerable to criminals defrauding users.* While

Verified Shareholder Derivative Complaint

Block included a telephone number on the back of its Cash Card and in its Cash App Terms of Service, for many years this telephone number did not connect consumers to customer support of any type. Instead, it led to a pre-recorded message directing consumers to contact customer support through the app. Consumers could only contact Block through the app or through U.S. mail and were often met with delayed, inadequate, confusing, or inaccurate responses. Consumers looking for an alternate route to Cash App customer service through web searches were targeted by fraudsters posing as Cash App representatives, who tricked them into giving up their passwords and other personal information. Block knew that its customers were being targeted by fraudsters in this way but failed to take timely action to address the issue.

### **REPURCHASES DURING THE RELEVANT PERIOD**

147.   During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of approximately $330 million to repurchase approximately 4.7 million shares of its own common stock at artificially inflated prices from December 2023 through April 2024.

148.   According to the 2023 10-K, between December 1, 2023 and December 31, 2023, the Company repurchased 1,121,000 shares of its own common stock at an average price per share of approximately $72.44, for a total cost to the Company of approximately $81,205,240.

149.   As the Company's stock was actually worth only $66.84 per share, the price at closing on May 1, 2024, the Company overpaid by approximately $6,277,600 for repurchases of its own stock between December 1, 2023, and December 31, 2023.

150.   According to the Form 10-Q the Company filed with the SEC for the first quarter of 2024 (the "1Q24 10-Q"), between February 1, 2024 and February 29, 2024, the Company repurchased 1,104,000 shares of its own common stock at an average price per share of approximately $67.52, for a total cost to the Company of approximately $74,542,080.

Verified Shareholder Derivative Complaint

151. As the Company's stock was actually worth only $66.84 per share, the price at closing on May 1, 2024, the Company overpaid by approximately $750,720 for repurchases of its own stock between February 1, 2024 and February 29, 2024.

152. According to the 1Q24 10-Q, between March 1, 2024 and March 31, 2024, the Company repurchased 956,000 shares of its own common stock at an average price per share of approximately $80.66, for a total cost to the Company of approximately $77,110,960.

153. As the Company's stock was actually worth only $66.84 per share, the price at closing on May 1, 2024, the Company overpaid by approximately $13,211,920 for repurchases of its own stock between March 1, 2024, and March 31, 2024.

154. According to the Form 10-Q the Company filed with the SEC for the second quarter of 2024 (the "2Q24 10-Q"), between April 1, 2024 and April 30, 2024, the Company repurchased 1,287,000 shares of its own common stock at an average price per share of approximately $75.51, for a total cost to the Company of approximately $86,023,080.

155. As the Company's stock was actually worth only $66.84 per share, the price at closing on May 1, 2024, the Company overpaid by approximately $11,158,290 for repurchases of its own stock between April 1, 2024, and April 30, 2024.

156. Thus, in total, during the Relevant Period, the Company overpaid for repurchases of its own stock by approximately $31.4 million.

## DAMAGES TO BLOCK

157. As a direct and proximate result of the Individual Defendants' conduct, Block has lost and will continue to lose and expend many millions of dollars.

158. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

Verified Shareholder Derivative Complaint

159. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, including the Customer Misconduct, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

160. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations, including the investigations/actions discussed herein taken by the SEC, DOJ, and CFPB, and all costs associated therewith.

161. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

162. Such losses include the Company's overpayment of approximately $31.4 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed above, as well as the **over $500 million** in insider sales Defendant Dorsey made during the Relevant Period.

163. As a direct and proximate result of the Individual Defendants' conduct, Block has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

164. Plaintiff brings this action derivatively and for the benefit of the Company to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholder, directors, and/or officers of

Block, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b), 20(a), and 14(a) of the Exchange Act.

165. Block is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

166. Plaintiff is, and has been at all relevant times, a shareholder of Block. Plaintiff will adequately and fairly represent the interests of Block in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

167. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

168. A pre-suit demand on the Board is futile and, therefore, excused. When this action was filed, Block's Board consisted of the following ten individuals: Defendants Botha, Brooks, Deighton, Dorsey, Garutti, McKelvey, Meeker, and Narula (the "Director-Defendants") and non-parties Shawn Carter and Anthony Eisen (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to five of the ten Directors that were on the Board at the time this action was filed.

169. Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to engage in and/or cause the Company to engage in the Customer Misconduct and to make false and misleading statements and omissions of material fact, while they caused the Company to repurchase its own stock at artificially inflated prices. The Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

Verified Shareholder Derivative Complaint

170. In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted Block to engage in the Customer Misconduct and to issue materially false and misleading statements. Specifically, the Director-Defendants caused Block to issue false and misleading statements which were intended to make Block appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

171. Additional reasons that demand on Defendant Dorsey is futile follow. Defendant Dorsey is a cofounder of the Company and has served as its Principal Executive Officer and as the Chairman of the Company's Board since July 2009 having previously served as its CEO and President since July 2009 until his title changed to Block Head as of April 2022. He is also a controlling shareholder of Block. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Dorsey with his principal occupation for which he receives handsome compensation. As PEO, Defendant Dorsey is ultimately responsible for the Company's engagement in the Customer Misconduct and all of the false and misleading statements and omissions that were made during the Relevant Period, including those which he personally made. As the Company's highest officer and as the trusted Board Chairman, Defendant Dorsey conducted little, if any, oversight of the schemes to cause the Company to engage in the Customer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Further, Defendant Dorsey signed the 2019, 2020, 2021, and 2022 10-Ks which contained false and misleading statements. He also solicited the false and misleading 2022, 2023, and 2024 Proxy Statements which resulted in, *inter alia*, shareholders voting to reelect several of the Individual Defendants

to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. Moreover, Defendant Dorsey is a defendant in the Securities Class Action. In addition, his insider sales during the Relevant Period, where he netted proceeds of *over $500 million*, further demonstrate his motive in facilitating and participating in the schemes. For these reasons, Defendant Dorsey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

172. Additional reasons that demand on Defendant Botha is futile follow. Defendant Botha has served as a Company director since January 2011 and has been the Company's Lead Independent Director since June 14, 2022. He also serves as a member of the Audit and Risk Committee and the Compensation Committee. Defendant Botha has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Customer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Botha signed the 2019, 2020, 2021, and 2022 10-Ks which contained false and misleading statements. He also solicited the false and misleading 2022, 2023, and 2024 Proxy Statements which resulted in, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Botha breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

173. Additional reasons that demand on Defendant Deighton is futile follow. Defendant Deighton has served as a Company director since May 2016. Defendant Deighton also serves as Chair of the Audit and Risk Committee and as a member of the

Verified Shareholder Derivative Complaint

Compensation Committee. Defendant Deighton has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Customer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Deighton signed the 2019, 2020, 2021, and 2022 10-Ks which contained false and misleading statements. He also solicited the false and misleading 2022, 2023, and 2024 Proxy Statements which resulted in, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Deighton breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

174. Additional reasons that demand on Defendant Garutti is futile follow. Defendant Garutti has served as a Company director since July 2017. He also serves as Chair of the Nominating and Corporate Governance Committee. Defendant Garutti has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Customer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Garutti signed the 2019, 2020, 2021, and 2022 10-Ks which contained false and misleading statements. He also solicited the false and misleading 2022, 2023, and 2024 Proxy Statements which resulted in, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Garutti breached his fiduciary duties, faces a substantial likelihood of

Verified Shareholder Derivative Complaint

liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

175. Additional reasons that demand on Defendant McKelvey is futile follow. Defendant McKelvey is a co-founder of the Company and has also served as a Company director since July 2009. Thus, as the Company admits, he is a non-independent director. Defendant McKelvey has received and continues to receive compensation for his role as a director as described above. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Customer Misconduct and to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant McKelvey signed the 2019, 2020, 2021, and 2022 10-Ks which contained false and misleading statements. He also solicited the false and misleading 2022, 2023, and 2024 Proxy Statements which resulted in, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant McKelvey breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

176. Additional reasons that demand on Defendant Brooks is futile follow. Defendant Brooks has served as a Company director since October 2019. She also serves as a member of the Nominating and Corporate Governance Committee. Defendant Brooks has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Customer Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Brooks signed the 2019, 2020, 2021, and 2022

10-Ks which contained false and misleading statements. She also solicited the false and misleading 2022, 2023, and 2024 Proxy Statements which resulted in, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Brooks breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

177. Additional reasons that demand on Defendant Meeker is futile follow. Defendant Meeker has served as a Company director since June 2011. She also serves as Chair of the Compensation Committee. Defendant Meeker has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Customer Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Meeker signed the 2019, 2020, 2021, and 2022 10-Ks which contained false and misleading statements. She also solicited the false and misleading 2022, 2023, and 2024 Proxy Statements which resulted in, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Meeker breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

178. Additional reasons that demand on Defendant Narula is futile follow. Defendant Narula has served as a Company director since July 2023. She also serves as a member of the Audit and Risk Committee and the Nominating and Corporate Governance Committee. Defendant Narula has received and continues to receive compensation for her role as a director as described above. As a trusted Company director, she conducted little,

if any, oversight of the schemes to cause the Company to engage in the Customer Misconduct and to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded her duties to protect corporate assets. She also solicited the false and misleading 2024 Proxy Statement which resulted in, *inter alia*, shareholders voting to reelect several of the Individual Defendants to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company. For these reasons, Defendant Narula breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

179. Additional reasons that demand on the Board is futile follow.

180. Defendants Botha, Deighton, and Narula (collectively, the "Audit Committee Defendants") served as members of the Audit and Risk Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public including breaches of fiduciary duty and violations of the Exchange Act; failed to ensure adequate internal legal compliance and due diligence controls; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

181. In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' schemes to cause the Company to engage in the Customer Misconduct and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment,

abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director-Defendants face a substantial likelihood of liability and demand is futile as to them.

182. Block has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for Block any part of the damages Block suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

183. The Director-Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

184. The acts complained of herein constitute violations of fiduciary duties owed by Block's officers and directors, and these acts are incapable of ratification.

185. The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Block. If there is a directors' and officers' liability insurance policy covering the Director-

Verified Shareholder Derivative Complaint

Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Block, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

186.   If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Block to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

187.   Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM
### Against the Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

188.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

189.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security

(other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

190. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

191. Under the direction and watch of the Individual Defendants, the 2022, 2023, and 2024 Proxy Statements failed to disclose that: (1) though the Company claimed its officers and directors adhered to the Code of Conduct, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2022, 2023, and 2024 Proxy Statements' descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements and participate in the Customer Misconduct.

192. The 2022, 2023, and 2024 Proxy Statements also failed to disclose that: (1) the Company failed to monitor the nature of the transactions that were being processed on its platforms and lacked due diligence practices; (2) the Company became a hotbed to facilitate illegal activities by imposing minimal obligations on users seeking to open accounts and encouraging the use of bitcoin on its platforms; (3) Company management disregarded signs that their platforms were being used for unlawful and unethical activities; and (4) as a result, the Company was facing damage to its reputation and possible regulatory risk. As a result of the foregoing, the Company's statements concerning its business, prospects, and operations were materially misleading and lacked a reasonable basis at all relevant times.

193. In the exercise of reasonable care, the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the

Verified Shareholder Derivative Complaint

statements contained in the 2022, 2023, and 2024 Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on matters set forth for shareholder determination in the 2022, 2023, and 2024 Proxy Statements, including, but not limited to, the re-election of directors and approval of the Plan.

194.   As a result of Defendants Dorsey, Deighton, Botha, Brooks, McKelvey, Garutti, Meeker, Rothstein, Summers, and Walker causing the 2022 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to reelect Defendants Dorsey and Deighton to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

195.   As a result of Defendants Botha, Brooks, McKelvey, Garutti, Meeker, Rothstein, Summers, Walker, Dorsey, and Deighton causing the 2023 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Botha, Brooks, and McKelvey to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

196.   As a result of Defendants Garutti, Meeker, Dorsey, Deighton, Narula, Botha, Brooks, McKelvey, and Rothstein causing the 2024 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to re-elect Defendants Garutti and Meeker to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company.

197.   The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the 2022, 2023, and 2024 Proxy Statements.

198.   Plaintiff, on behalf of Block, has no adequate remedy at law.

## SECOND CLAIM
**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

199.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

200. The Individual Defendants participated in schemes to defraud with the purpose and effect of defrauding Block. Not only is Block now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Block by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase *4,468,000* of its own shares at artificially inflated prices, damaging Block.

201. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

202. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Block not misleading.

203. The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Block.

204. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in

Verified Shareholder Derivative Complaint

that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

205. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

206. Plaintiff, on behalf of Block, has no adequate remedy at law.

### THIRD CLAIM
### Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act

207. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

208. The Individual Defendants, by virtue of their positions with Block and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Block and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Block to engage in the illegal conduct and practices complained of herein.

209. Plaintiff, on behalf of Block, has no adequate remedy at law.

### FOURTH CLAIM
### Against the Individual Defendants for Breach of Fiduciary Duties

210. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

211. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Block's business and affairs.

212. Each of the Individual Defendants violated and breached their fiduciary duties

of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

213. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Block.

214. In breach of their fiduciary duties owed to Block, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) the Company failed to monitor the nature of the transactions that were being processed on its platforms and lacked due diligence practices; (2) the Company became a hotbed to facilitate illegal activities by imposing minimal obligations on users seeking to open accounts and encouraging the use of bitcoin on its platforms; (3) Company management disregarded signs that their platforms were being used for unlawful and unethical activities; and (4) as a result, the Company was facing damage to its reputation and possible regulatory risk. As a result of the foregoing, the Company's statements concerning its business, prospects, and operations were materially misleading and lacked a reasonable basis at all relevant times.

215. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

216. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

217. In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices before the fraud was exposed.

218. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Block's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

219. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

220. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Block has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

221. Plaintiff, on behalf of Block, has no adequate remedy at law.

### FIFTH CLAIM
### Against the Individual Defendants for Unjust Enrichment

222. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

223. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Block.

224. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Block that was

Verified Shareholder Derivative Complaint

tied to the performance or artificially inflated valuation of Block, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

225. Plaintiff, as a shareholder and a representative of Block, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

226. Plaintiff, on behalf of Block, has no adequate remedy at law.

### SIXTH CLAIM
### Against the Individual Defendants for Abuse of Control

227. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

228. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Block, for which they are legally responsible.

229. As a direct and proximate result of the Individual Defendants' abuse of control, Block has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Block has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

230. Plaintiff, on behalf of Block, has no adequate remedy at law.

### SEVENTH CLAIM
### Against the Individual Defendants for Gross Mismanagement

231. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

Verified Shareholder Derivative Complaint

232.   By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Block in a manner consistent with the operations of a publicly held corporation.

233.   As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Block has sustained and will continue to sustain significant damages.

234.   As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

235.   Plaintiff, on behalf of Block, has no adequate remedy at law.

## EIGHTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

236.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

237.   The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

238.   As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Block to waste valuable corporate assets by, paying excessive compensation and incurring many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

239.   In addition, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, thereby wasting the Company's assets.

240.   As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

Verified Shareholder Derivative Complaint

241.  Plaintiff, on behalf of Block, has no adequate remedy at law.

## **PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)  Declaring that Plaintiff may maintain this action on behalf of Block, and that Plaintiff is an adequate representative of the Company;

(b)  Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Block;

(c)  Determining and awarding to Block the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)  Directing Block and the Individual Defendants to take all necessary actions to reform and improve Block's corporate governance and internal procedures to comply with applicable laws and to protect Block and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Block to nominate at least five candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)  Awarding Block restitution from the Individual Defendants, and each of them;

Verified Shareholder Derivative Complaint

(f)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)    Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: March 25, 2025                    Respectfully submitted,

**THE BROWN LAW FIRM, P.C.**

*/s/*Robert C. Moest
Robert C. Moest, Of Counsel, SBN 62166
2530 Wilshire Boulevard, Second Floor
Santa Monica, CA 90403
Telephone: (310) 915-6628
Facsimile: (310) 915-9897
Email: RMoest@aol.com

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

*Attorneys for Plaintiff*

Verified Shareholder Derivative Complaint

## VERIFICATION

I, Anand Roy, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 21st day of March, 2025.

_Anand Roy_
Anand Roy

3/21/2025

8170-18-a1-0000244-0001-0000768